Raheem v. Warden Mr. Olive May it please the Court, Mark Olive appearing with Gretchen Stork for the Appellant. The lower court, District Court in this case, wrote with respect to the Respondent's Appellee's Dr. Martel. Dr. Martel testified that Petitioner's shrunken brain and various deficits in temporal lobe functioning would be of interest to a jury considering how to sentence Petitioner. That's at tab 8, page 59. Petitioner's brain is relevant to two claims which I'd like to argue before the Court today. The first is the substantive incompetence claim that Petitioner was tried while he was incompetent. The second is an effective assistance of counsel with respect to brain damage and other mental health issues and time permitting. I'll address the question of whether the State's closing argument and the Defense Counsel's closing argument exhibited an effective assistance of counsel for not objecting to one and for delivering the other. With respect to incompetence, the rule forbidding the trial of someone who is incompetent. You're talking procedural, substantive. Substantive. It comes from DROP at 171. It stems from the ban against trials in absentia as, quote, the mentally incompetent defendant, though physically present in the courtroom, is in reality afforded no opportunity to defend himself. Dr. Martell, again, if Petitioner was having absent seizures at the time of trial, quote, it's certainly conceivable that he could zone out at a moment when there's critical testimony and miss that testimony. And the judge below says the record establishes that Petitioner suffered from severe depression and compensated with conduct that interfered with his ability to that he suffers from brain damage, and it supports his contention that he suffers from absent seizures. The lower court assumed that the appellate did suffer absent seizures at the trial. Order at 81. Now, the state court did not adjudicate the substantive competence claim on state post-conviction review, right? That's correct. So as the district court, I think, ruled, and as the state conceded, there's no epidefference to give to that substantive competency claim. Correct. But we have the district court's determination on habeas review that although the question was review, why do you believe that the district court's ruling on competence on the substantive side constituted clear error? Well, there are three preliminary issues. One, I think the judge didn't give due credit to the fact that the defendant was psychotic, didn't give due credit to behavior in court, and didn't give due credit to expert opinions. And finally, the lower court did not consider the affidavit of Dr. Karen, who's an epilepsy expert. At footnote 92 of our brief, we present to the court the common sense argument that if a judge is conducting de novo review on substantive competency claim, that judge has to consider all evidence that's available. Karen affidavit wasn't considered by the lower court. It's in the record. And we presented it and argued at footnote 92 that with respect to a competency determination, it ought to be considered. The judge did not consider. And Melissa Karen, at document 24-7, lists all of her credentials. She is a heavily credentialed epilepsy expert. And at page 16, she goes through, and I'm not going to read the whole paragraph or maybe any of it, but there's 15 lines where she discusses the incompetency ramifications of epileptic seizures or epilepsy disorders. Some of it is the seizures themselves affect Mr. Rahim's ability to assist his attorneys and understand the proceedings. Frequent seizures during which he is unconscious and suffers amnesia necessarily affect his ability to follow narrative, to respond appropriately, and to understand fully what is taking place, etc. She goes on. She didn't know whether or how many seizures he had had during the trial. She would have to interview him for that. That would be part of the evidentiary record. But no, we don't know how many he had during the trial. And we know that on time, some of which are problematic, he reacted to what was going on in the trial. It wasn't as though he was spaced out the entire time. That's, we're not making the allegation that he was absent the entire time. We're making the allegation that because of these seizures and other things, but because of these seizures, he was functionally absent. Is it your position that she did not consider this problem or that she didn't agree with you in the resolution of the problem? She did not consider, Dr. Karan. She didn't consider that he had suffered from absence seizures? The reason I raise it is I'm reading from the factual findings on the competency made by the district court. She says, among other things, the following. She says, the record establishes that Petitioner suffered from severe depression and compensated with conduct that interfered with his ability to assist his counsel. The record supports Petitioner's contention that he suffers from brain damage, possibly organic in origin. And it supports his contention that he suffers from absence seizures of brief duration. The record establishes the attorneys were alert to the issue of competency and concerned about it. They worried about it, consciously assessed the issue, and determined grounds did not exist to support a request for competency. Based on the review of the record, the court assumes arguendo that Petitioner did suffer from brief absence seizures at the trial. And then nevertheless, the court concludes, based on what she characterizes as, quote, narrowness of the competency standard and the totality of the evidence, that Petitioner has not demonstrated his incompetence at the time of trial by a preponderance of the evidence. So she obviously considered the seizure problem, although she doesn't say in high verb, so-and-so said x, y, and z. But is there any way to read this other than to suggest that the district court considered the totality of the evidence, including the evidence on seizures? Well, she couldn't have considered the totality of the evidence on seizures because she didn't consider the affidavit of Dr. Karen. How do we know that? Because we tried to get her to, and she declined to do so. It was, there were motions before the decision in the case, and you can find the rulings at tabs 7 and tabs 4, where the judge below declined to consider the Karen affidavit. The Karen affidavit was submitted in state post-conviction after the hearing. And what was her explanation for not considering it? You can't just attach an affidavit to a pleading and file it with the court, which was, I think, almost a direct quote. And so she wasn't going to consider it. The state had argued that it wasn't part of the record in state court. But in the Wilson case before this court, the state argued that the record isn't closed until the notice of appeal is filed and the Karen affidavit was filed before. But regardless, we could have filed it independently from it having been filed in state court. On a de novo review of a competency claim, all available evidence has to be considered and the Karen affidavit was available. The judge expressly didn't consider it. Going back to even one seizure at a critical point, even one seizure, anything that makes you absent would render you incompetent according to, I can't remember if it was DROPE or Dusky, DROPE. And this court held or did not hold in Farrell that it declined to address the issue in Farrell. You remember in Farrell, the defendant in the courtroom was literally flopping on the floor from a seizure. And we argued in that case that he was functionally absent. And this court said we need not address that because he granted relief on an effective assistance claim. But suggesting that if you're absent due to a seizure, that could be a competency issue. And that's exactly what DROPE says at 171. Our client in this case was not flopping on the floor in the courtroom. He was flopping on the floor in the jail cell. And the deputy reported to counsel and counsel reported to the court that he had had seizures. That's not what they said. He fell to the floor unconscious with his eyes rolling back in his head two times. But are you making the assumption that epileptic seizures are continuous? And if he had them in the jail cell, he's obviously had them in the courtroom? What? I don't know. Well, he had them during his confession. We know that. It's in Dr. Caron's affidavit. So around the time, that would have been about 18 months before trial, counsel Futch looked at the seizures that were excerpted from Dr. Martel's interview. And said where the seizures occurred, that's exactly what he was seeing from the client pre-trial and post-trial, he was having seizures. Well, what about during trial? Well. Because somebody had them on a given date, later had them on another date, doesn't necessarily mean that he had them on all dates. Do we have... But he had constant seizures, according to... They were happening like eight at a time when he was being interviewed by Dr. Martel. Is there any evidence from these trial counsel or from anybody else who was in the courtroom that he had them during the trial? They didn't say he ever had any seizures. So even though they knew he had two in the jail cell, uh, so no, although counsel Futch did say when reviewing Dr. Martel's video, yep, that's exactly how he was when he saw us. He would just fade away. And indeed in court, he was slumping in the chair. What Dr. Karen says is that when you have a seizure, it's not just a seizure while you're absent. It's when you come out of it because you don't really know what's happened to you. You don't really know what's going on. Was he having seizures during the state collateral proceedings? Yes. That's when Dr. Martel... Yeah. Well, you mean in the courthouse during... I mean, in the jail during the... Anytime. That Dr. Martel said, I videotaped him for two days and he had, I think it was two days and he had eight striking seizures that were quite apparent to him. That lasted what duration? He would say from 10, I believe he said 10 to 30 seconds and he would try to arouse, he would try to wake him up. Sometimes he would wake up on his own after 10 seconds and be confused and try to make excuses for where he'd been. Sometimes it'd take him 30 seconds and he would try to wake him up. So these were consistent throughout his life. Oh, you went back and examined his life history and he had seizures growing up. He had them a lot. They didn't describe them as seizures. They just said he would be absent. Yes. Well, what was his, what was the record about seizures during his long mental health treatment before the crime? You know, when Dr. Farrar was seeing him. Dr. Farrar and Dr. Nord, they did not discuss seizures. Right. So the problem is that it looks like no one other than Martel discerned it post hoc after the fact. Farrar didn't on the front end, Nord didn't on the front end, Herendon didn't on the front end, and even Gurr said, boy, I didn't see it. I missed it. I only focused on it after Martel said that there were maybe eight instances of that happening in the case. So if it happened and happened with regularity, the only one, at least among the mental health experts to discern the matter was Martel. Right. I have that right. As far as you've gone. But Dr. Karen said, I looked at the interrogation video. Right. It was happening all over the interrogation video as well. And also then when you get that information and you go back and you check with family members on the social background and history, you discover seizures throughout his childhood or at least episodes which they described, their description fits seizures. This case is unusual in the number of experts, psychologists, psychiatrists, neuro, et cetera. Did any of them offer an opinion about whether seizures continue fairly continuously or whether they come and go over periods of time? I would have to go through Dr. Karen's affidavit. But I think that they, I can't give you a direct answer on that. I think it's in Dr. Karen's affidavit. It just seemed like the premise of your argument that we're trying to get to would have been a great thing to ask some of the experts. I'm not faulting you for not, but I just was hoping that you had. I think it's in Dr. Karen's affidavit, but I'll check it while I'm listening to the other side. On the mitigation side, so you can at least get to part of that. Sure. What do you think was, and this may not be a completely fair question because I know your argument focuses on the totality of mitigation evidence that trial counsel didn't put on, but of all the pieces of evidence that you highlight, which do you think are the two or three most important? I think the fact that they did not do a neuropsychological battery test, because they didn't do that and they were asked to do that, it was suggested that it was needed by two experts, Heron, Dean, and Farrar. They didn't do it. When we did it, Dr. James Evans did a complete neuropsych evaluation and concluded that taken as a whole, this evaluation indicates widespread cortical dysfunction and probably greatest in temporal areas. And these areas of the brain recognize and solve, I'm not quoting anymore, recognize and solves problems, engage in abstract reasoning, shift task and process sequentially, engage in purposeful self-controlled behavior. And Mr. Rahim's cognitive deficits predispose him to confusion and mental decompensation, particularly when responding to complex stimuli. So first brain damage, and we know from certainly Jefferson and from a bunch of Supreme Court decisions that brain damage, even possible brain damage is highly mitigating in a case and could explain here what is otherwise inexplicable. Am I correct in understanding here that when the lawyers spoke to the experts and they had four of them and said, okay, tell us what you want, what they were told was that he should do an MRI and a PET scan and then they proceeded to schedule both and they accomplished only one. Was there anything that any of these four experts told the lawyers they ought to do that the lawyers did not do? And if so, where would I find that in this record? At tab eight, page 34, the district court said the experts told counsel, quote, a full battery of neuropsychological testing was needed. And there's a note, I can't remember what exhibit number it is, but there's a note of a meeting with Farrar and counsel in which Farrar tells counsel a neurological exam by a neuropsychologist would help. We're grasping at straws if we don't have something unusual with neuropsych. Did they hire a neuropsychologist? They did not. Let me ask the question this way. When the testing was done later by Martell, would it be fair to say that Martell administered a full battery of tests? It would. So the tests that he ran were pretty much the same that Evans had run. Maybe there were more. But he's got a chart at the end of his affidavit that lays all that out. Right. But the answer would be yes. I think they had some different ones, but they were both full neuropsych testing. I don't think they lined up exactly, but pretty close. Mr. Olive, do you want to take some of your time or you want to save the full time? I'll take a couple more minutes. Okay. Let me ask you then just about one other issue that, speaking for myself, concerned me. And that was the comment by the prosecutor in closing argument to the jury, quote, he'll kill you and I'm not having to guess. Right. Do you want to address that for a moment or two? There's not much I can say about that other than I'm looking at three fine ex-prosecutors. You can't say that. You know, you can't say, A, former prosecutors. I didn't even catch that. Your eyebrows went up, though. The, I lost my train of thought. First, he said, jurors, I'm telling you, it's not in the record, but people escape from prison. Not anywhere in the record. And then says, he will kill, he doesn't say it. He yells at them. He will kill you. That's just, you can't even find cases that address that because it's so out of bounds. Let's assume all of that's true and you do not have to convince me, speaking for myself, that the conduct was absolutely wrong. It was beyond the pale. Even if he could explicate the dangerousness, he was not free to turn around and then say to the jury that he's going to get you guys. Having said that, though, explain to me how you find that, given the context of everything else here and the determinations made, that you can get over the second hump of prejudice. Prejudice. Well, if you take the state at its word, defense counsel, in this case, presented a lot of mitigating evidence. This was an inexplicable crime in that he shot his best friend for no apparent reason. He then, I mean, the crime was just insane. He then took a Lexus, put a body in it, drove it around showing it to people. And then he went and burned the body where people on train could see it. His behavior was bizarre. There's no question about it. But if the state is right, then they presented mental health evidence. And so the balance could be there and this could push you over the balance. So I think that there's an easy prejudice argument there. And one other, Judge Jordan, move on. Judge Jordan. Yes, thank you. You've answered my question. Judge Jordan, you said, what are the other good mitigating circumstances in this case? And they are that people told Askia, the father of our client, he needed help. In fifth grade, teacher said, he needs a psychological evaluation. He wouldn't allow it. When he went at age 15 to a commitment because he had tried to shoot himself in the head, the physicians there wanted to treat him with psychotropic medication. He resisted depressants and said he wanted to dad wanted to use herbal medicines. They convinced him finally to allow antidepressants, but would not allow antipsychotics. And as Dr. Pettis says in his affidavit, that's the way you properly treat the condition this young fellow had. And had he been treated this way, perhaps the incident in the case wouldn't have happened. So failure to get adequate treatment and the brain damage. If I may, I'll reserve time for rebuttal. Thank you, Mr. Hall.  May it please the Court. My name is Chanel Singh and I'm here on behalf of the warden asking this court to affirm the district court's denial of relief. I'll start with the substantive competency claim, since that's what Mr. Rahim's counsel started with. Can I ask you one question to start up where he ended? Sure. If I can flip your argument around. Is this prosecutor still working for the state of Georgia? Your Honor, my understanding is that the prosecutor for Henry County is now Mr. Petillo and this was Mr. Floyd. I don't know what he's... No, maybe not as the district attorney or whatever. I'm just asking if he's still around and still trying death penalty cases. I don't believe he is, Your Honor, but I can't say that with certainty. That's not in the record. I know he's not the district attorney now. No, it's okay. He's the one who had this court... I hope I'm not getting my cases mixed up between this one and the one coming up later in the afternoon, but is he the prosecutor who had this court condemned some of his conduct in a prior case before the sentencing proceedings in this case took place? I'm not aware of that, Your Honor. Maybe I've got the two cases mixed up then. Thank you very much for answering my question. Yes, Your Honor. Well, Your Honor, to... When he said he'll kill you... Yes, Your Honor. Was he talking about anybody and everybody or was he making an argument that he was going to kill the members of the jury? Exactly, Your Honor. I think that's... I mean, that's a question. In the context in which he stated it, do we know? I think, Your Honor, as the district court said, by the cold record, it's ambiguous to or generally the community because right before he said those comments, he was talking about Mr. Rahim's future dangerousness and that he threatened to kill the district attorney. He threatened to kill his, he being Mr. Rahim, his girlfriend who was a witness in the case, a jail guard. He ran the cell block and he caused so much fear in his cell inmates that they slept on the floor instead of the bunk because he wanted to use his bunk for his own personal items. And so in that context, that's where the state habeas court said that it was a proper future dangerousness argument. So I think, I don't think that decision by the state habeas court that you can say that no fair-minded jurist would have ruled as the state habeas court did in that case because of the whole context. Of course, when you look at Crumbly's response in his closing argument, it would be fair to say, would it not, that Crumbly took the prosecutor's remarks as being, among other things, addressed to the jury individually and specifically rather than you all referring to all mankind. Well, I think, Your Honor, simply because Mr. Crumbly spin the argument that way doesn't mean that the jurors would have necessarily believed that Mr. Floyd, the district attorney, was talking to them. And I'd like just to note that there, even if, which we don't concede that there is, but even if that was air, there would be no prejudice in this case. And I think Darden versus Wainwright shows that because in Darden versus Wainwright, the prosecutor in that case said that he wished that defendant, Mr. Darden, had no face and that it was blown away with a shotgun. And certainly if that statement didn't rise to the level of a constitutional deprivation of fair trial, this comment in this case didn't, especially because of the context. Except that here, this is sort of a combination. If you interpret it as being a comment directed to the jurors themselves, it is a combination impermissible golden rule argument where you are essentially telling the jury to place themselves in the position of one side or the other or hear possible victims in the future, which is problematic on a lot of fronts, right? Well, I think, Your Honor, given this court ... The defense lawyer would never have been allowed, never have been allowed to tell the jurors, put yourselves in the place of Mr. Rahim's mother. And if you were his mother or his father, you would never want to see a child put to death. So put yourselves in her position, in his position, and don't sentence their son to death. That would have never been allowed because it would have been a blatant appeal to the wrong sorts of things that a jury is supposed to consider. If you interpret the comments here as directed to the jurors themselves, it's the flip side of the coin. Well, to that, Your Honor, I'd answer with respect to the golden rule argument. This court has addressed that in the AEDPA context, and that was in Reese v. Secretary for the Department of Corrections, a Florida case. And this court said that because the Supreme Court has not specifically relayed that such arguments are unconstitutional, that it wouldn't be unreasonable for the state habeas court to not grant relief. And so I think that would also apply in this case. I thought your strongest argument there is that defense counsel obviously, you can see in the record, made a strategic decision not to object but to turn the argument around saying fear is our enemy here. It's the state's ally. That's why Mr. Floyd got up close to you and yelled at you that we know one thing for sure and that that is he'll kill you. Mustafa is responsible for getting all that fear started, but you can stop it. The states want you to give in to it. And I'd agree with that, Your Honor, that that is a strong argument. And so I guess what I was trying to say, and perhaps inartfully, that there are several reasons for why the state habeas court's denial of its ineffective assistance claim is not objectively unreasonable. And yes, I would agree that that would be the stronger argument. Are you suggesting that a prosecutor could turn to the jury, let's assume he was referring to the jury, and tell the jury that this guy is going to kill you? No, Your Honor, I'm not suggesting that. That would be misconduct, wouldn't it? I'm not suggesting that. I'm asking whether that would be misconduct. You would certainly have to concede that, wouldn't you? It's one thing to say about future dangerous, this is a dangerous guy. Look, he killed two people, Hollis and Hollis' mother. He threatened to kill a witness in the case. He threatened to kill the prosecutor in the case. He threatened to kill a guard in the case. What's more, they found dangerous weapons in his cell. What's more, they found in the cell a map suggesting a jail attempt. All of which yields a fair argument about danger. But you're not suggesting, based on that, you could tell the jury as well, when there are threats to the prosecutor, a witness, and a guard, that you could suggest to the jury that maybe they got some exposure or they got something to worry about too? Well, Your Honor, I'm not necessarily saying that it wouldn't be prosecutorial misconduct. But what I am saying is that in this case, Mr. Rahim would be precluded from relief. And that's because there is no prejudice. Okay. We've moved on to another point. The only reason I raise it is I look at it, quote, this man, after he laid out these threats to the prosecutor, to the witness, to the guard, he goes on to say, quote, this man is just mean, ladies and gentlemen. In just plain old country English, he's mean. He's cold hearted. He's cold blooded. And let me tell you something, he'll kill you. And I'm not having to guess. You can look at the pictures again because I know you already have. We know what he's capable of. And we know what he's done. That's the exact quote. So your answer, it seems to me, is even if it was error, there's no prejudice. Or at least a state court determination was neither unreasonable nor contrary. Too clearly established law. Yes, Your Honor. That's exactly correct. Why don't you help us with the substantive competency determination by the district judge? Yes, Your Honor. And if I could, please begin with answering Chief Judge Karn's question about whether any of the mental health experts addressed the length and time of the absence seizures and how long they can last. So Dr. Gur in the state habeas evidentiary hearing did address that matter. He said that for a seizure to last for a long period of time in terms of hours, that would be very rare. And so that's what he said. And he also added that these types of seizures, even if you become absent, wouldn't cause you to go and kill someone during one of those seizures. And he said that in conjunction with the length of time. But that latter point is irrelevant, right, to the competency determination. It may go to dangerousness or something else. But the fact that you're not going to kill someone because of a seizure says nothing at all about whether or not you are able to rationally understand the proceedings and assist your counsel, right? Yes, Your Honor. That's correct. And so thank you for bringing me back on point. And I think that addresses the district court's finding, which was that even if Mr. Rahim had these other manifestations of mental illness, because the competency standard is so narrow, he couldn't meet that standard. In this case, he couldn't meet that burden. And in this case, as the district court laid out from the evidence that was before the state habeas court, Mr. Rahim's trial counsel met with Mr. Rahim numerous times. They never thought that he was incompetent in their own interactions. And they, in the very early parts of their representation, had talked to their mental health expert. No one had indicated to trial counsel that they thought that Mr. Rahim was incompetent. And with respect to the question that was asked earlier about what was in Mr. Rahim's medical records about these absence seizures, and so in his charter, Peachford Hospital records, it specifically says that there was no history of seizures or neurological problems. And with respect to supporting the district court's decision, the district court also took into account Dr. Martel's testimony, in which case Dr. Martel had explained that he was, in his opinion, not incompetent either. And I can't remember if this was in the district court's order specifically, but I know Dr. Martel did testify in support of the district court's decision that Mr. Rahim, all of his tests that he had underwent in investigating his mental health by both his trial counsel and his post-conviction counsel, he generated valid results. And that's because he was able to be oriented to time, place, and manner. He was cooperative with all of his mental health experts. And if he were incompetent, he wouldn't be able to have these valid results. Mr. Olive says in part that the district court improperly failed to take into account the affidavit of Dr. Karen. Can you talk to us about that? Sure, Your Honor. With respect to the affidavit of Dr. Karen, I know that this was not before the state habeas court because it was not submitted at the evidentiary hearing. With respect to the district court, I think . . . But to go to that first point, this is my understanding of the way AEDPA works. But you tell me if you think I've got it wrong. If there is a merits adjudication, a federal habeas court is limited to the record generated before the state court and the federal court cannot hold an evidentiary hearing to supplement that record, right? That's correct, Your Honor. So far, so good. Okay. If there is no state court adjudication of a claim or if the state court improperly applies a procedural bar, then the general litany of AEDPA deferential standards don't kick in, right? Yes, Your Honor. Right so far? Yes, Your Honor. And that means that the federal habeas court, generally speaking, has de novo review or whatever other review is applicable but not AEDPA deferential review, right? That's correct, Your Honor. Okay, so here's the fourth point. Hopefully, I've got this one right too. In a case like this one, the federal district court is not limited to the record generated in the state court proceeding because the state court never addressed and decided the merits of the claim and the district court was considering the substantive competency issue de novo. Is that correct as well? Well, Your Honor. In other words, if Mr. Rahim had presented an affidavit for the very first time at the of what weight it ultimately gave it, would that have been the right thing to do? The legally correct thing to do? Well, Your Honor, whether the district court was obliged to not look at that, I'm not certain so I don't want to say the wrong answer but what I do know is that the district court wasn't incorrect to limit itself to the state habeas court and not . . . It doesn't say that the answer is X or Y but was the district court required and it may have considered it. The fact that it didn't say it, it doesn't necessarily mean one thing or the other. But as a general matter, in a case like this one with this procedural history, was the district court required to consider an affidavit that was, in your view, not part of the state court record? I don't think the district court was required to, Your Honor, and the case in support of that answer would be Lawrence because the same thing happened in Lawrence where there wasn't an adjudication on the petitioner's substantive incompetency claim but there was an adjudication on the ineffective assistance of counsel claim regarding counsel's alleged failure to raise the issue of competency and the district court in that case took the same corpus of evidence that was used to adjudicate that ineffective assistance claim. And refused to consider new evidence that was presented or just wasn't given new evidence to consider? Well, Your Honor, whether it wasn't given new evidence, I'm not certain on that but I do know that the district court denied an evidentiary hearing in that case. Okay, so you don't . . . I don't want to put words in your mouth. The answer is that the district court was required or not required to consider Dr. Karen's affidavit? I think the district court was not required to consider Dr. Karen's affidavit. However, in this . . . And the reason for that is what, legally speaking? I think the reason for that is that the petitioner, Mr. Rahim, had a full and fair hearing at the state court level and even though the specific claim of substantive incompetency wasn't adjudicated, the facts supporting any adjudication were before the court. But there's no adjudication. But I think, Your Honor . . . Which provision of 2254 says that the district court is limited to the state court record at this point in time? Your Honor, again, I don't think the state or the district court was limited but I don't think the district court was required. And those two things are a dissonance to me. I don't think they're the same thing because . . . I want to know what discretion . . . I guess what you're saying is the district court has discretion not to consider it and I'm asking you what legal principle that discretion is based on? Well, Your Honor, again, I think that legal principle would go back to Mr. Rahim having already had a full and fair hearing and not being entitled to an evidentiary hearing in this case. However, I think the more efficient answer for Mr. Rahim's case . . . I don't think the district court erred, Your Honor. And again, I think because the competency standard is so narrow, there was already enough evidence before the district court . . . So what you're saying is effectively it wouldn't have made a difference even if she had considered it? That's correct, Your Honor. But also she assumed that Mr. Rahim was having the absent seizures. So I think irrespective of Dr. Karan not being mentioned in her order, she assumed that he was having what Dr. Karan diagnosed him with. So I think still she determined that Mr. Rahim was able to assist his counsel and he was able to understand the charges against him given the . . . So your argument is even assuming arguendo, she was obliged to consider everything under the circumstances of this case, it didn't matter because she accepted as a fact that which Karan was seeking to prove. But that's your argument. Yes, Your Honor. But let me probe that a little bit further. Suppose the affidavit lays out at length and in detail a picture of regular seizures lasting 10 to 30 seconds with a frequency that would suggest that they occurred in the course of the trial itself. That'd be pretty relevant stuff, wouldn't it? Can the district court just refuse to look at that on the grounds that it was sort of a day late and a dollar short? I don't think, Your Honor, the district court can refuse to look at that. Again, here there was no evidence that Mr. Rahim was experiencing seizures of that type at the time of his trial. I would just like to add that here no one has specifically, besides Dr. Karan, if we take the affidavit, has diagnosed Mr. Rahim as having these absent seizures. All that Dr. Martel said is that his behavior, what he saw in his interview, was consistent with absent seizures. Both Dr. Gur and Dr. Martel said that in order to definitively diagnose somebody with absent seizures, they need to be subject to an examination where they had electrodes put on their head and then their brain wavelengths would be measured in the hospital to determine if he was actually having the seizure. That didn't happen here. Was there anything in the Karan affidavit that went to that question, whether in fact the defendant had ever been tested for epilepsy? Your Honor, I can't recall, so I don't want to mislead the court, but I know that in the record, Mr. Rahim had not been tested for epilepsy according to his charter Peachford Hospital records. But I mean even collaterally, there's no indication he was tested for epilepsy, correct? Correct, correct. Yes, Your Honor. That's what I mean. There was a great deal of additional mental health expert testimony that came in collaterally. That did not include any epileptic testing, is that correct? Correct, Your Honor, correct. That is correct, Your Honor. And Your Honor, if there are no further questions about substantive incompetency, I'd like to go to the ineffective assistance of counsel claim here. And I understand Mr. Rahim is alleging that his trial counsel was ineffective with respect to the mental health investigation. And I think the most efficient way to answer that question is that there would be no prejudice here. Let me, before you get to prejudice, is there any record evidence here that any of the four psychologists and psychiatrists who had been employed by the defendant's counsel to help the defendant ever told or suggested that something be done that wasn't done? Yes, Your Honor. The State Habeas Court found as fact that that not to be the case. I understand the affidavits of Dr. Farrar. He says that he informed trial counsel to conduct the full battery of neuropsychological testing. But Mr. Crumbly testified at the State Habeas hearing that they conducted every test that they were told to do so. And the only test that they did not conduct was the PET scan. And that was because Mr. Rahim refused to partake in that examination. And I think because the State Habeas Court found that as fact, Mr. Rahim can't overcome that credibility determination absent a showing of clear and convincing evidence. And I think there is facts in the evidence to support the State Habeas Court's decision on that end. And to move on to prejudice, Your Honor, the State Habeas Court reasonably found that there would be no prejudice in this case because the purpose for which Mr. Rahim is using this organic brain damage evidence is to show that he's impulsive, that he's prone to violence and aggression, and that he has difficulty planning. The impulsivity portion was presented at trial with Dr. Nord saying that Mr. Rahim was impulsive. As to Mr. Rahim being prone to violence and aggression, that's more aggravating than mitigating. And with respect to Mr. Rahim having difficulty planning, the State Habeas Court specifically found that even if Mr. Rahim's evidence is viewed in the most mitigating light, that it can be reconciled with facts of the case. And that's because Mr. Rahim engaged in calculation and planning for a crime that took place over a 10-hour period. He fired the gun outside his window, according to Mr. Jenkins, so the gun wouldn't jam. And he shot Brandon and the gun didn't jam. After he shot and killed Brandon, he took the keys for his house from his pocket and then he went to Ms. Miriam Hollis' house. And earlier, before he even picked up Brandon, they went to the Kroger where they bought trash bags. At that time, Mr. Jenkins knew that what the trash bags were going to be for is that if someone's in the house, they were going to kill that person and that trash bag was going to be used for the cleanup. And that's what he did. And then afterwards, he told Mr. Jenkins that he killed Ms. Hollis because she had promised to give him the Lexus that she owned. But by the way, I didn't get this from any of the briefs, but it's just a little piece of historical fact that I wonder what the answer is. Had he ever, quote unquote, paid her the $8,000 for the Lexus or that's something that he came up with or had made up on his mind too? Because he told some people that the reason he had killed her was because she had paid her $8,000 and she refused to turn the Lexus over to him. Did that ever happen or was that something he just made up or said? Yes, Your Honor. That was a state's theory that that was something he said because there was never any evidence to indicate whether any such contract took place between him and Ms. Hollis. That also, going back to your argument on what the organic brain damage evidence might have shown, might not it also have shown that he was just maybe not in the legal sense, but in some other sense, just crazy? And of course, I know that there are two sides to the coin, right? You can be a complete sociopath and commit these murders and that's certainly one explanation. But the other one is that if there's no real motive for them, no real explanation for them and you have some of the other conduct that was at issue, you start having some doubts about this person's mental state, right? And that's one of the arguments that Mr. Olive is making, that this organic brain evidence, had it been presented, would have gone to show one side of that coin as opposed to the other. What is your response to that possibility? To that, Your Honor, my response would be that that was presented at trial, although with not an organic brain damage element, it was presented as a psychiatric element. That Mr. Rahim has borderline personality disorder and he suffers from clinical depression and as part of his borderline personality disorder, he embellishes things. He tells stories and that's how he tries to look bigger to people than he actually is, which is his false bravado. So that was presented to the jury by trial counsel and the jury rejected that argument just because now he's putting an organic ideology instead of a psychiatric one, doesn't change the fact that there was mental health evidence presented at trial. I have one question, it's just procedural in nature. It goes back to Chief Judge Carnes' question about whether or not there was evidence about seizures during trial. How long, remind me how long was the trial phase of the case, the guilt phase of the case? Your Honor, I know it was, I believe it was about three, so the trial was February 5th to 17th and that was the guilt and the sentencing phase. Was there a break between them as sometimes happens or they went straight into the guilt, the sentencing phase? They went straight into the sentencing phase, Your Honor. So about a week and a half total? Yes, I would say so. Okay, thank you. And again, that was not observed by trial counsel and trial counsel specifically watched that video in the state habeas proceeding and said, and that's Mr. Crumling, he said he never saw anything like that and the state habeas court took that into consideration as well. Okay. So unless the court has any further questions. But Futch said he did, right? Yes, Your Honor, Futch said . . . Not during the trial, but before the trial. Correct. He said that some of the responses on there were consistent with what he saw, but for the most part during trial, he was appropriate. I couldn't tell from the briefing. Did he say how pre-trial that was? I'm sorry, Your Honor? Did he say when, how long before or how short before trial? No, Your Honor, it was just generally. Yes, Your Honor. Everything that occurred in this guy's life and everything that occurred in the case was pre-trial up to the time they started the trial, so that doesn't really help us a lot. I mean, they were appointed to represent him a long time before the trial. Correct, Your Honor. So we don't know when he observed those symptoms. Correct, Your Honor. We don't know when and we don't know how often. What we do know is that Futch tells us that, oh yeah, I saw that sometimes before the trial. That was the beginning, the middle, and the end of the evidence. Correct, Your Honor. We don't know what part of the evidence . . . No, no, I'm just asking. There was no further questioning of Futch about that.  But he said pre-trial. Pre-trial, Your Honor. Did he say pre-trial, before trial, during the trial, after the trial? Your Honor, he said that during the trial he was all right, but some of those behaviors that he saw, I took it to mean pre-trial. Okay. And . . . Thank you. Mr. Olive. Okay. With respect, Judge Marcus, to your question about whether counsel failed to do something that experts told him to do, the State Court finding that he did not fail to do what he was asked can't be supported by the record. As the lower court said, experts said a full battery of neuropsych testing was needed. Farrar said I and others recommended that a full neuropsych exam by a neuropsych be conducted. No such testing was conducted. But maybe I've misapprehended this. Just help me. I thought, and if I have this wrong, correct me, that the State habeas judge found as a fact that the lawyers for the defendant did everything that the mental health experts suggested they do. And that they were never told to do something that they turned down. Do I have that right? Is that not what the State Court finds? You have that right and it's not supported by the record? Okay. I thought also, and we've got two cases today and one tomorrow, and I may be confusing other cases. I thought also that was in the brief, it would have to be the red brief, that some of the experts suggested to trial counsel, not only did trial counsel not do it, but State habeas counsel, to which you and your predecessor didn't do it either. Am I wrong about that? We didn't do a PET. We didn't do a PET scan. So the mere fact that you don't do one of the tests doesn't indicate you're below a wide range of reasonable effective assistance. Well, when you're told to do neuropsych testing and if you don't do it, we're grasping them at straws, that seems like a pretty imperative request. Well, we have nothing unless you do that. I would think a PET scan was fairly imperative if you're looking for organic brain damage. Yeah, the PET, the MRI, they could come out clean and neuropsych testing could find brain damage. Or the PET scan could find it too. It could, but it also could miss it. You can literally see it. Sometimes they're shown to the jury. And it's very popular with defense attorneys. Yeah, and expensive. I take it though in this case, you did a variety of things collaterally. One thing that I didn't find that you did was order a PET scan. Right. Right. So no PET scan was ever done. Correct. By the defendant collaterally. I just wanted to be sure on that. That kind of puzzles me because I thought, and again, I may have just been reading selectively, but I thought that you all heaped some criticism on the trial counsel for the way they took him to get the PET scan and the fact that he didn't get it was their responsibility and that was the big deal. I'm speaking colloquially. Isn't that one of your arguments against the trial counsel? Well, our argument was that they did not accompany him as he requested. I know, but the only result of that was he didn't get the PET scan, but yet y'all didn't accompany him either because you didn't order one. Well, we got an MRI. We did what our experts asked us to do. Our expert, Dr. Girth. Part of what the experts asked you to do. What our experts asked us to do. Our expert said, please get an MRI. Okay, so just so I understand this, you're not contending that trial counsel were deficient in not getting a PET scan? They were deficient in not going with him to get the PET scan. But how can you be deficient in not going with him to get the PET scan if it's not deficient to not get the PET scan? If they had not ordered the PET scan as you didn't order the PET scan, would they still be deficient? In our opinion, yes. Because they sent who they knew was a psychotic client on the road. But you didn't even send a client on the road. Our experts didn't ask us to. We did send the client on the road for an MRI and we went with him. So a counsel is deficient. The counsel's deficiency depends solely on which expert he is. One of them advised you not to get or didn't advise you to get a PET scan, yet his expert advised him to get a PET scan. That's what happened in Jefferson. Do neuropsych testing. So they did neuropsych testing. A different way of approaching that same question, I think, might be to ask that if there was no PET scan obtained in the state post-conviction or district court proceedings, how do you show prejudice from the failure to get the PET scan at sentencing? We're showing prejudice from the failure to do the neuropsych testing. Which includes the PET scan. No, it doesn't. Okay, so then it wasn't... A neuropsych battery is different. You abandon any argument then or you're abandoning it now, intentionally and voluntarily relinquishing it under Johnson v. Zerbs. That, that... You know I'm going to say no to that. But I like the way the question sounds. That it was deficient. That it was ineffective assistance of counsel to Prong not to get the PET scan. It's outside the wide range of reasonable professional assistance not to accompany him there. And there's a reasonable probability of a different result if they had just gotten the PET scan. So, yes, I agree with that. The latter but not the former. Pardon? You agree with the last comment but not the former. Let me ask you one final question before you sit down. I want to come back again to the Karan affidavit. Is there any case law out there that you can point us to that would say under circumstances like this, it would be error for the Federal District Court making her own de novo review of competency not to consider the affidavit of Karan? I will submit a supplemental letter brief. But, yes, you're supposed to, in determining competency, consider all available evidence. And if indeed it is error, is there any case out there that says that's necessarily reversible error? Because you have here the problem that you have to get over is that the court here says, I'm quite prepared to accept and do accept that he suffered from occasional seizures. But based on the totality of the record, I do not believe and do not find that he was not competent. Well, that should be enough. I mean, once she says he was absent during trial, that should be enough. But Judge Karan. But Judge Karan, that wasn't, I didn't understand that to be the factual basis. He suffers from occasional seizures doesn't mean he suffered from seizures during the trial. She assumed that. She expressly assumed that. She said, assuming arguendo, or I'm assuming that's true. And in that case, then he's incompetent. And Judge, expert Karan says that paragraph 7, epilepsy is a condition in which an individual is predisposed to recurrent seizures. Over the course of this trial, recurrent seizures are quite probable. The state mentioned, I don't know what time I have left. Am I open? You are, but finish that thought. Okay. Well, I have about three. But this thought is that you don't have to do an EEG or a brain scan in order to determine whether someone has epilepsy. Dr. Karan said seizures are classified according to type. And while an EEG exam is necessary to attempt to positively identify the type of seizures Mr. Rahim suffers, his presentation on the video is consistent with the person suffering from either absent seizures or brief complex partial seizures and goes on to discuss epilepsy. If I could make one last point. Briefly. While Dr. Martel may have said that in his opinion, Petitioner was competent, when he was asked about the following, Dr. Farrar told the appellate, told counsel that the appellant was delusional, schizophrenic and had a psychotic process going on. Dr. Martel was asked about that. He said, well, there may have been a psychotic process going on. Question, right. Then there should have been a competency evaluation. Thank you.